**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 15 |
|  | : |  |
| MURRAY HOLDINGS LIMITED,[1] | : | Case No. 15-11231 (MG) |
|  | : |  |
| Debtor in a Foreign Proceeding. | : |  |
|  | : |  |

------------------------------------------------------------- x

### DECLARATION OF ARNALDUR JON GUNNARSSON IN SUPPORT OF
### CHAPTER 15 PETITION AND REQUESTED RELIEF

---

[1] The Isle of Man registered number of Murray Holdings Limited is 080684C.  The mailing address and registered office of Murray Holdings Limited is 69 Athol Street, Douglas, Isle of Man IM1 1JE.

## TABLE OF CONTENTS

I.     Introduction and Overview .................................................................................... 3

II.    Background of the Company .................................................................................. 4

       A.     General Background of the Company .................................................... 4

       B.     Pre-Liquidation Transactions ................................................................ 6

       C.     Litigation ................................................................................................ 8

       D.     The Company's Assets ........................................................................ 11

       E.     The Company's Liabilities ................................................................... 14

III.   The Liquidation and the Isle of Man Scheme Proceeding ................................. 17

       A.     The Company's Liquidation Proceedings and Overview of the
              Administration of the Company by the Liquidator .............................. 17

       B.     The Nominated Directors are Foreign Representatives of the Company ............. 20

       C.     The Isle of Man Scheme Proceeding is a Foreign Main Proceeding .................. 21

IV.    The Isle of Man Scheme ..................................................................................... 25

       A.     Overview of the Isle of Man Scheme .................................................. 25

       B.     The Creditors of the Schemes and Distributions ................................. 26

       C.     The New Facility Agreements .............................................................. 27

       D.     Releases, Indemnities and Injunctions in the Isle of Man Scheme and the
              Deed of Settlement and Release .......................................................... 28

       E.     Solicitation and Sanction of the Isle of Man Scheme .......................... 31

       F.     The Isle of Man Scheme Should be Recognized and Enforced in the
              United States ........................................................................................ 34

I, Arnaldur Jon Gunnarsson, being duly sworn, state the following under penalty of perjury:

1.    I was appointed as a director of Murray Holdings Limited (the "Company") by written resolution (the "Kirna Resolution") of Kirna ehf. ("Kirna") dated March 19, 2015, a true and correct copy of which is attached hereto as Exhibit A.[2]

2.    Kirna is a company incorporated in Iceland and the sole member of the Company.  My appointment as a director took effect at midnight on March 31, 2015 pursuant to an order made on March 26, 2015 (the "Appointment Order") by the High Court of Justice of the Isle of Man (the "Isle of Man Court").  A true and correct copy of the Appointment Order is attached hereto as Exhibit B.  I am also an attorney employed by Kaupthing hf ("Kaupthing"), located at Borgartun 26, IS – 105, Reykjavik, Iceland.  As discussed below, Kirna is a wholly owned subsidiary of Kaupthing.  Accordingly, Kaupthing is the Company's indirect parent.  I also hold the position of Managing Director of Non-Operating Assets at Kaupthing.  I am an attorney to the District Courts of Iceland and a member of the Icelandic Bar Association since 2009.  My personal i.d. number in Iceland is 100484-2779.

3.    The Kirna Resolution also appointed Arnar Scheving Thorsteinsson ("Mr. Scheving Thorsteinsson") as a director of the Company, which appointment also took effect from midnight on March 31, 2015 pursuant to the Appointment Order.  Mr. Scheving Thorsteinsson also holds the position of Managing Director of Non-Operating Assets of Kaupthing.  Neither Mr. Scheving Thorsteinsson nor I were directors of the Company at any time prior to our appointment on March 31, 2015.  In the Kirna Resolution, Kirna expressly nominated Mr.

---

[2] The Company's name was Isis Investments Limited (in liquidation) until it was legally changed to Murray Holdings Limited on March 19, 2015 (effective by court order on March 31, 2015), also pursuant to the Kirna Resolution.  Accordingly, all exhibits attached hereto, most notably the Isle of Man Scheme (defined below), reference the name Isis Investments Limited (in liquidation).

Scheving Thorsteinsson and me as the "Nominated Directors" of the Company in accordance with paragraph 13.2 of the Company's Scheme of Arrangement (the "Isle of Man Scheme") pursuant to section 152 of the Isle of Man Companies Act 1931 (the "Companies Act"), which became effective on December 23, 2014 pursuant to an order of the Isle of Man Court dated December 22, 2014 (the "Isle of Man Sanction Order").  A true and correct copy of the Isle of Man Sanction Order is attached hereto as Exhibit C.  A true and correct copy of the Isle of Man Scheme is attached to the Isle of Man Sanction Order.

4.      As discussed in detail below, the Isle of Man Sanction Order expressly authorized the Nominated Directors (as defined in the Isle of Man Scheme) to, among other things, seek relief in this Court under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code").

5.      As explained in more detail below, the reason for seeking recognition in this jurisdiction is that the Company has significant assets in the United States, in the form of shares of Spirit Realty Capital, Inc. ("Spirit"), which shares trade on the New York Stock Exchange under the symbol SRC.

6.      I submit this declaration (this "Declaration") in support of (a) the Company's petition (the "Chapter 15 Petition") for relief under chapter 15 of the Bankruptcy Code and (b) the *Verified Petition of the Foreign Representative for Recognition of the Isle of Man Foreign Proceeding as a Foreign Main Proceeding, and Motion for (I) Recognition and Enforcement of the Isle of Man Scheme of Arrangement and the Order of the Isle of Man Court Sanctioning the Isle of Man Scheme of Arrangement, (II) a Final Decree and (III) Certain Related Relief* (the "Verified Petition and Motion").  I am duly authorized to make this statement

on behalf of the Company and Mr. Scheving Thorsteinsson in his capacity as the other Nominated Director.

7.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my opinion based upon my experience and knowledge of the Company's financial condition, my review of relevant documents or information supplied to me by Mr. Andrew Paul Shimmin (the former Liquidator Provisional and Liquidator of the Company, as further described below) ("<u>Mr. Shimmin</u>", the "<u>Liquidator Provisional</u>" or the "<u>Liquidator</u>"), or his professional advisers.  I am over the age of 18 and, if called to testify, would testify competently to the facts set forth herein.

## I.     Introduction and Overview

8.     On December 15, 2014 the Company's creditors unanimously voted to approve the Isle of Man Scheme and a scheme of arrangement in England and Wales pursuant to Part 26 of the English Companies Act 2006 (the "<u>English Scheme</u>" together with the Isle of Man Scheme, the "<u>Schemes</u>").   There was only one voting group or class of creditors under the Schemes (the "<u>Scheme Creditors</u>").   The Scheme Creditors were entitled to receive distributions under the Schemes, and such distributions have now been paid.   The Company provided an explanatory statement (the "<u>Explanatory Statement</u>") to Scheme Creditors in connection with the solicitation of votes to approve the Isle of Man Scheme.   A true and correct copy of the Explanatory Statement (with all included appendices) is attached hereto as <u>Exhibit D</u> and is referenced throughout this Declaration.

9.     Prior to the Isle of Man Court sanctioning the Isle of Man Scheme, separately, on December 19, 2014 the High Court of Justice of England and Wales (the "<u>English Court</u>") sanctioned (via the "<u>English Sanction Order</u>") the English Scheme. The English Scheme has materially identical terms to the Isle of Man Scheme.   The Verified Petition and Motion does

not ask the Bankruptcy Court for recognition or enforcement of the English Scheme; however, solely for the Bankruptcy Court's reference, a true and correct copy of the English Sanction Order is attached hereto as <u>Exhibit E</u>.  A true and correct copy of the English Scheme is attached to the English Sanction Order.  Like the Isle of Man Scheme, the English Scheme became effective in accordance with its terms on December 23, 2014.

10.     Additionally, on April 21, 2015, a court in the British Virgin Islands, the Eastern Caribbean Supreme Court in the High Court of Justice, entered an order dated April 1, 2015 in aid of the English Scheme generally staying and restraining any actions or enforcement in respect of any of the Company's property, including property in the British Virgin Islands.  A true and correct copy of such order is attached hereto as <u>Exhibit F</u>.

## II.    Background of the Company

### A.    General Background of the Company[3]

11.     The Company was incorporated in the Isle of Man on August 29, 1996 as a private company limited by shares with registered number 080684C pursuant to the Companies Act.  A true and correct copy of the Company's Certificate of Incorporation is attached hereto as <u>Exhibit G</u>.  On March 31, 2015, when the Company changed its name from Isis Investments Limited (In Liquidation), the Company's registered office was also changed to 69 Athol Street, Douglas, Isle of Man IM1 1JE from the office of the former Liquidator, which was also in the Isle of Man.

12.     The Company is an investment entity with no operations or employees of its own.  It holds cash and equity assets which are described in greater detail below.  As noted above, the Company is a wholly owned subsidiary of Kirna.  Kirna is a wholly owned subsidiary

---

[3] The background of the Company and Kaupthing (defined below) are discussed in Clauses 4.1-4.9 of the Explanatory Statement at pages 12 -26.

of Kaupthing.  (Explanatory Statement Clause 4.1(b)).  The nominal capital of the Company is

£2,000 divided into 100 ordinary shares of £1.00 each and 1,900 redeemable preference shares of

£1.00 each.  One ordinary share and 1,000 redeemable preference shares have been issued.  (Id.

at 4.1(e)).  A copy of the Company's articles of association is attached hereto as <u>Exhibit H</u>.  The

Company's organizational structure is as follows:



13.     Kaupthing was established in 1982, initially as a securities firm, and

subsequently extended its operations into investment banking.  (Explanatory Statement Clause

4.4(a)).  Kaupthing became a commercial bank in 2003 and provided integrated financial

services to companies, institutional investors and individuals.  Kaupthing was, and remains,

headquartered in Reykjavik, Iceland.  Historically, through its subsidiaries, and by itself,

Kaupthing had operations in thirteen countries, including each of the Nordic countries (Denmark,

Finland, Iceland, Norway and Sweden), the Netherlands, Belgium, Luxembourg, Switzerland,

the United Kingdom and the United States.  (<u>Id.</u> at 4.4(b)).  However, in late 2008, during a

period of extreme difficulties experienced by Iceland's financial sector, the government of

Iceland displaced Kaupthing's board of directors.  (<u>Id.</u> at 4.4(c)-(d)).  Kaupthing was later placed

into an Icelandic process akin to a United States receivership, and then later, on May 25, 2009,

into an Icelandic court-supervised winding up proceeding, under the direction of a winding up committee (the "Winding Up Committee.")[4] (Id. at 4.4(f)-(g)).

14.    The Company was established as an investment vehicle for Kaupthing and its related companies.    (Explanatory Statement Clause 4.5(a)).   To the best of my knowledge, during the period 1996-2002, prior to the appointment of the Liquidator, the Company was involved in a series of minor investments during which time Kaupthing held a custodian account for the Company.  On October 20, 1996, the Company and Kaupthing entered into an agreement (the "Asset Management Agreement") which concerned the management and custody of financial assets belonging to the Company.  Pursuant to the terms of the Asset Management Agreement, Kaupthing accepted management of the Company's financial assets and agreed that Kaupthing's investments would be entered into by the Company in accordance with an investment strategy stipulated in the Asset Management Agreement.

### B.    Pre-Liquidation Transactions

15.    During the period from late 2005 until late 2007, the Company entered into a series of high value, substantial, transactions.   Each of these transactions (the "Pre-Liquidation Transactions") is briefly summarized below, and are described in greater detail in Clause 4.8 of the Explanatory Statement.  Ultimately, the purpose of both of the Schemes was to compromise certain claims and disputes arising out of these Pre-Liquidation Transactions as well as returning the Company to solvency by the adjustment of its debts.  The descriptions set forth of the Pre-Liquidation Transactions are in summary form, and parties should refer to the Explanatory Statement for a more complete discussion:

---

[4] On November 30, 2008, Kaupthing commenced a case under chapter 15 of the Bankruptcy Code in this Court. Kaupthing's chapter 15 case is being administered under Case No. 08-14789 (MG) (Bankr. S.D.N.Y. 2008).  I am not seeking to have Kaupthing's chapter 15 case and the Company's chapter 15 case jointly administered by the Court.  Furthermore, my counsel and I do not presently anticipate that issues in such cases will overlap.

a.    ***The Somerfield Transaction***.[5]   In late 2005, the Company, Kaupthing, Tazamia Limited (in liquidation in the British Virgin Islands (the "BVI")) ("Tazamia"), Brigetta Investments Limited (in voluntary liquidation) ("Brigetta"), and other third party investors entered into a series of transactions to acquire the Somerfield supermarket chain located in the United Kingdom (collectively, the "Somerfield Transaction") through an entity called Violet Equityco Limited ("VEL"), an acquisition subsidiary. Shortly after VEL acquired Somerfield, Kaupthing transferred various interests related to the Somerfield Transaction to the Company.   These interests were comprised of (i) Kaupthing's rights and obligations as lender under a £67.15 million advance by Kaupthing to Tazamia made in connection with Tazamia's participation in the Somerfield Transaction (the "Tazamia Loan"); (ii) Kaupthing's equity interest in VEL; and (iii) 8,500 ordinary "B" shares in Tazamia (the "Tazamia B Shares") (discussed below).   In consideration for the transfer from Kaupthing to the Company, the Company executed two promissory notes (the "KF Promissory Notes") in favor of Kaupthing Finance ehf. ("Kaupthing Finance") dated December 30, 2005, in the amounts of £67.15 million (the amount loaned under the Tazamia Loan) and £17 million (the amount of the aforementioned shares Kaupthing subscribed for in VEL).

Thereafter, throughout the course of 2006, the Company entered into certain sub-participation agreements (the "Sub-Participation Agreements", and the counterparties thereto, the "Sub-Participants") in respect of the Tazamia Loan and the Tazamia B Shares.  The general effect of these Sub-Participation Agreements was that, among other things, the Company was bound to repay to the Sub-Participants amounts advanced by them, together with an amount equal to 90% of the Company's profits on the Tazamia Loan and the Tazamia B Shares.

b.    ***The Framework Agreement***.[6]   In 2007, Kaupthing, the Company, and certain other parties entered into a Framework Agreement, which was intended to restructure certain investments held for the benefit of a trust called the Tchenguiz Discretionary Trust ("TDT"), which held various assets including interests in connection with Tazamia, among others.   At or around this time, the Company invested in an entity named Oscatello Investments Limited (now in liquidation) ("Oscatello") via (in part) loans to Oscatello's parent, Eliza Limited (in liquidation) ("Eliza").   Oscatello was the principal holding company for the investments of TDT.  Oscatello, in turn, paid certain funds to the Company in return for certain economic benefits of the VEL shares and arguably the Tazamia Loan, discussed above.   Among other things, the Framework Agreement provided for a payment waterfall in respect of any return on the VEL shares and, arguably, the Tazamia Loan.

When Somerfield was sold in February 2009, the Company received over £129 million, triggering the Sub-Participants' right to be paid under the Sub-Participation Agreements and also triggering certain of the Company's obligations to Oscatello under the Framework Agreement.  Because the Company believed that the amount to which

---

[5] The Somerfield Transaction is discussed in Clauses 4.8(b)-(i) of the Explanatory Statement at pages 19 -20.

[6] The Framework Agreement is discussed in Clauses 4.8(j)-(p) of the Explanatory Statement at pages 20-21.

Oscatello was entitled under the Framework Agreement was uncertain, the Company paid the proceeds of its Somerfield investment to the English Court and commenced proceedings to ascertain the meaning of the Framework Agreement.

c.     ***The Basiliko Transaction***.[7]  In 2006, Kaupthing and the Company agreed to invest in Sampo oyj, an insurance company incorporated in Finland.  The Company funded its investment through a money market loan from Kaupthing on March 28, 2006; on the same date the proceeds of the loan were purportedly paid to an entity called Basiliko Enterprises Limited (the "Basiliko Transaction").

d.     ***The Redford Transaction***.[8]  In 2007, Kaupthing loaned funds to the Company to be used for the Company's investment in Redford Australian Investment Trust, which in turn was to acquire an investment in Spirit, as described below (the "Redford Transaction").

e.     ***The Alumdawn Transaction***.[9]  Kaupthing asserted that, on behalf of the Company, it advanced sums to an entity called Alumdawn Limited (now dissolved) ("Alumdawn") to facilitate the acquisition and lease-back of certain LA Fitness facilities, and in turn the Company was to invest in Alumdawn shares (the "Alumdawn Transaction").

### C.     Litigation

16.     The Pre-Liquidation Transactions discussed above gave rise to various litigation proceedings commencing as early as February 2009.  The commencement of certain of these proceedings predates the Company's liquidation proceedings, while certain others were commenced by Mr. Shimmin in his capacity as the Liquidator on behalf of the Company, or by others against the Company, during the liquidation proceedings.  The hallmark of both of the Schemes is to compromise and resolve the bulk of the proceedings and the claims raised therein, while other proceedings and claims will be left unresolved to continue in the post-scheme litigation.  Each proceeding which has been wholly or partially compromised pursuant to the Schemes is summarized briefly below:[10]

---

[7] The Basiliko Transaction is discussed in Clauses 4.8(q)-(s) of the Explanatory Statement at pages 21-22.

[8] The Redford Transaction is discussed in Clauses 4.8(t)-(u) of the Explanatory Statement at page 22.

[9] The Alumdawn Transaction is discussed in Clauses 4.8(v)-(x) of the Explanatory Statement at page 22.

[10] The descriptions of the litigation provided herein are summary in nature, and are only intended to provide a high-level overview.  However, each of such proceedings are described in great detail in Clauses 4.9 and 5.6(e)-(f) of the Explanatory Statement at pages 22-26, and 41.

a.   ***Action 599 Proceedings***.[11]   On February 29, 2009, the Company commenced and thereafter amended proceedings (the "Action 599 Proceedings") in the English Court against numerous parties including, without limitation, Kaupthing and Oscatello, among others, in connection with the Somerfield Transaction, the Basiliko Transaction, the Redford Transaction and the Alumdawn Transaction.   The Company sought various forms of relief including, without limitation, declarations that certain transactions be set aside, and monetary damages.   Although the vast majority of the claims asserted in the Action 599 Proceedings have been resolved by the Schemes, the Action 599 Proceedings have been amended to seek a determination of the meaning and construction of a key provision of the Framework Agreement, under which Oscatello has asserted a proprietary claim to certain monies held in the English Court. These "Revised 599 Proceedings" survive the Isle of Man Scheme and only concern the Company and Oscatello.  A copy of the Action 599 Consent Order entered by the English Court in accordance with the terms of the Isle of Man Scheme is attached hereto as Exhibit I.

b.   ***Kaupthing Finance English Proceedings***.[12]   On December 23, 2011, the Company commenced proceedings against Kaupthing Finance (the "Kaupthing Finance English Proceedings") in the English Court concerning relief sought in relation to the KF Promissory Notes and the purported money market loan in connection with the Basiliko Transaction, discussed above.   The Kaupthing Finance English Proceedings have been discontinued pursuant to the terms of the Schemes.

c.   ***Proof of Debt Proceedings***.[13]   Kaupthing, Kaupthing Finance and Oscatello filed proofs of debt in the Company's liquidation.  On February 20, 2012 the Liquidator rejected each of Kaupthing's, Kaupthing Finance's and Oscatello's proof of debt claims.  Those parties each appealed the Liquidator's decision to reject their claims (commencing the "Proof of Debt Proceedings"). The Proof of Debt Proceedings have been discontinued pursuant to the terms of the Schemes.

d.   ***Isle of Man Proceedings***.[14]   On December 23, 2011, the Liquidator on behalf of the Company commenced proceedings in the Isle of Man Court against (i) Kaupthing and Kaupthing Finance (the "Kaupthing Proceedings") and (ii) certain former directors (the "Former Directors") of the Company (the "FD Claim").   Each of these claims relates to the same transactions which are the subject of the Action 599 Proceedings.  On May 23, 2012, the Kaupthing Proceedings and the FD Claim were consolidated (such consolidated proceedings, the "Isle of Man Proceedings").   As noted below, the Isle of Man Proceedings have been revised such that the FD Claim shall continue after the Effective Date (which occurred on December 23, 2014) of the Schemes between the Company and the Former Directors only.

---

[11] The Action 599 Proceedings are discussed in Clauses 4.9(a)-(g) of the Explanatory Statement at pages 22-23.

[12] The Kaupthing Finance English Proceedings are discussed in Clauses 4.9(v)-(x) of the Explanatory Statement at page 26.

[13] The Proof of Debt Proceedings are discussed in Clauses 4.9(j)-(k) of the Explanatory Statement at page 24.

[14] The Isle of Man Proceedings are discussed in Clauses 4.9(l)-(n) of the Explanatory Statement at pages 24-25.

e.    ***Zaria Global Proceedings***.[15]  On October 1, 2009, Zaria Global Limited ("Zaria Global") commenced an action against the Company in the English Court (the "Zaria Global Proceedings") in connection with its purported November 17, 2006 entry into a Sub-Participation Agreement.  Zaria Global sought sums allegedly owed and unpaid under such Sub-Participation Agreement.  Among other things, the Company denied that the relevant Sub-Participation Agreement was entered into, and denied that the signatories to the Sub-Participation Agreement had the authority to bind the Company.

f.    ***Icelandic Proceedings***.[16]  On December 30, 2009, the Sub-Participants filed proof of debt claims in Kaupthing's winding up proceeding, seeking compensation for potential losses that they allegedly incurred as a result of Kaupthing's misrepresentation of the investment in the Company and the Sub-Participants not receiving payment from the Company.  The Winding Up Committee in Kaupthing's proceeding rejected the claims and referred them to the District Court of Reykjavik (the "Icelandic Proceedings").  The Icelandic Proceedings were discontinued shortly after the Initial Distribution Date (as defined in each of the Schemes).

17.    The following currently pending proceedings have not been wholly compromised and resolved in connection with the Schemes:

a.    ***Action 363 Proceedings***.[17]  The Company commenced proceedings against the Former Directors (the "Action 363 Proceedings") in the English Court.  The Action 363 Proceedings mirror the Action 599 Proceedings insofar as they relate to the Company's claims against Kaupthing.  In short, the Company alleges that such Former Directors acted in breach of their duties by facilitating the Company's entry into the Framework Agreement and other agreements entered into in December 2007, the Basiliko Transaction, the Redford Transaction and the Alumdawn Transaction which, the Company alleges, were manifestly disadvantageous to the Company.  These claims by the Company were expressly carved out of the Schemes.  It is anticipated that the claims asserted against two of the three Former Directors in the Action 363 Proceedings will soon be settled.

b.    ***Revised 599 Proceedings***.[18]  Pursuant to the terms of the Schemes, the Company is generally seeking in the Revised 599 Proceedings: (i) the true meaning and construction of clause 6.1 of the Framework Agreement, specifically whether the payment waterfall provided at clause 6.1(A) – (D) in respect of the Violet Economic Return (as defined therein) provides for an amount of £44.15 million to be payable in the first instance to the Company (such amount representing the total sum originally invested by the Company referred to at (i) and (ii) of clause 6.1 in respect of the Violet Economic Return); and (ii) the quantum of Oscatello's Trust Claim to its proportion of the Violet Economic Return.

---

[15] The Zaria Global Proceedings are discussed in Clauses 4.9(o)-(s) of the Explanatory Statement at page 25.

[16] The Icelandic Proceedings are discussed in Clause 4.9(t) of the Explanatory Statement at page 25.

[17] The Action 363 Proceedings are discussed in Clauses 4.9(h)-(i) of the Explanatory Statement at pages 23-24.

[18] The Revised 599 Proceedings are discussed in Clauses 5.6(e)-(f) of the Explanatory Statement at page 41.

The outcome of the Revised 599 Proceedings will ultimately determine Oscatello's entitlement to the Resulting Amount.

c.   ***Revised Isle of Man Proceedings***.  Pursuant to an order of the Isle of Man Court entered into pursuant to the terms of the Schemes, the Isle of Man Proceedings have been amended such that the proceedings consist solely of claims against the Former Directors. It is anticipated that the claims asserted against two of the three Former Directors in the Revised Isle of Man Proceedings will soon be settled.

D.    **The Company's Assets**[19]

18.    Prior to the Schemes becoming effective, the Company's assets were comprised of: (i) the Company's shares in Spirit (the "Spirit Shares"); (ii) the proceeds of the Somerfield Transaction (listed above at £127,607,728.25), which were previously held by the English Court in the Action 599 Proceedings (the "Somerfield Proceeds") and were transferred to the account nominated by the Liquidator in the Isle of Man (the "Nominated Account"), save for the Resulting Amount (as defined below);[20] (iii) the deferred consideration paid from the proceeds of the Somerfield Transaction, which were previously held in the account of Boodle Hatfield LLP, the English lawyers for the Liquidator (the "Deferred Consideration"); (iv) the Tazamia B Shares; and (v) the Company's cash held in Isle of Man bank accounts and under the control of the then appointed Liquidator (the "IOM Bank Accounts").

19.    Following the Schemes becoming effective, as described below, the majority of the cash held in the Nominated Account and the IOM Bank Accounts were used to fund distributions under the Schemes.   Specifically, save for the Resulting Amount of £39,940,630 (the "Resulting Amount"), the Somerfield Proceeds, were transferred into the Nominated Account (the "Scheme Funds"). The Resulting Amount is the amount held in an

---

[19] A summary of the Company's assets prior to the implementation of the Isle of Man Scheme is provided in Clause 4.2 of the Explanatory Statement at pages 13-14.

[20] On February 3, 2013, the Company received £5 million out of the funds held at the English Court to fund the ongoing liquidation and related litigation expenses, together with carrying out investigations into the Company's affairs prior to the commencement of the Company's winding up proceedings.

account under the control of the English Court pending the final determination of Oscatello's claim in the Revised 599 Proceedings. The Scheme Funds were to be used to fund the distributions to be made to certain creditors of the Company under the Schemes. On March 3, 2015, the English Court paid the Scheme Funds, being the sum of £86,776,039.82, into the Nominated Account. The amount in the IOM Bank Accounts on March 3, 2015 was £5,962,300.89. The Scheme Funds, together with £2,547,096.78 (£220 of which is a provision to cover any bank charges) of the amount held in the IOM Bank Accounts were used to make the following payments under the Schemes on March 10, 2015: (i) £60,000,000 was used to pay the Sub-Participants their distributions under the Schemes; (ii) £28,570,113 plus interest was used to pay Oscatello its distribution under the Schemes; and (iii) £89,004.88 was paid to the Sundry Creditors. Each of these claims is set out in the discussion, below, of the Company's liabilities.

20.     After giving effect to the aforementioned distributions, the Company's assets following the Schemes becoming effective now consist of: (i) the Spirit Shares; (ii) the Tazamia B Shares; and (iii) cash of approximately £3,738,763.73 and $1,191,067.32 held by the Company in GBP and USD denominated accounts, respectively, with Barclays Private Clients International in the Isle of Man, being the IOM Bank Accounts. The remaining assets, save for the cash held in the IOM Bank Accounts, are described immediately below:

### 1.     The Spirit Shares

21.     The Company holds approximately 10,008,969 common equity shares in Spirit. Spirit, a Maryland corporation headquartered in Arizona, was incorporated on August 14, 2003 and organized to operate as a self-administered and self-managed real estate investment trust. As mentioned above, Spirit's common shares are publicly traded on the New York Stock Exchange under the symbol SRC.

22.     The Company acquired its Spirit Shares through Redford Australian Investment Trust, an Australian unit trust ("Redford").   Redford, which was formed by the Company, was used to acquire the Spirit Shares; however, Redford subsequently liquidated and distributed the Spirit Shares to the Company.   The Company's Spirit Shares are held in an account with AST Investor Services in New York, New York.

23.     It is my understanding that, during the Company's winding up proceedings, the Liquidator, from his office in the Isle of Man, frequently liaised with the Winding Up Committee regarding the Company's investments in Spirit.   The Company's shareholding in Spirit was worth approximately £68 million in total as of August 8, 2014.   As of May 8, 2015, the trading price of Spirit's stock closed at $11.40/share.   (See https://www.nyse.com/quote/XNYS:SRC.)   The Spirit Shares currently provide the Company with a dividend of approximately US$1 million (£650,000) per quarter.   Neither the future value of the Spirit Shares nor the anticipated dividend return can be regarded as certain due to the nature of publicly traded shares.

**2.     The Tazamia B Shares**

24.     The Company holds the Tazamia B Shares, which comprises 8,500 ordinary "B" shares in Tazamia, an entity incorporated and located in the BVI.   Tazamia is currently in solvent liquidation under the joint control of Stephen John Akers and Mark McDonald (the "Tazamia Liquidators") of Grant Thornton UK LLP and Grant Thornton (BVI) Limited, respectively.   The Tazamia Liquidators have not given any indication as to whether or when the Company will receive any distribution from Tazamia's liquidation, but it is believed that there is a real likelihood that these shares have substantial value.

### 3.    Other Potential Assets

25.    The Company has made various claims against the Former Directors in the Action 363 Proceedings and might, in the future, receive damages in connection therewith. Equally, though, these claims might be settled with limited cost or benefit to the Company.  As mentioned above, it is anticipated that the claims asserted against two of the three Former Directors in the Action 363 Proceedings will soon be settled.  Additionally, the Liquidator submitted a proof of debt claim on behalf of the Company to the liquidator of Eliza for approximately £181 million, but to date no funds have been received.  The Company may also hold certain immaterial assets in Iceland, e.g., bank accounts with limited deposits in Icelandic krona.

### E.    The Company's Liabilities

26.    Most of the Company's liabilities resolved by the Schemes arose mainly out of the Pre-Liquidation Transactions discussed above, which occurred prior to the commencement of the Company's winding up proceedings.  As described above, the Pre-Liquidation Transactions formed the basis for litigation which has been ongoing, and which the Liquidator controlled on the Company's behalf from the Isle of Man, for a number of years prior to the appointment of the Nominated Directors and the filing of the Chapter 15 Petition.  In the Company's winding up proceedings the Liquidator established a bar date of December 6, 2010 (the "Liquidation Bar Date") as the final date for the receipt and acceptance of proof of debt claims against the Company.[21]  A total of 30 proof of debt claims, with an aggregate value of £456,613,664.99 (plus interest, where applicable), were submitted by the Liquidation Bar Date.

---

[21] A descriptive overview of the proof of debt claims filed against the Company is provided in Clause 4.3 of the Explanatory Statement at pages 14-15.

The Company's known liabilities, as described below, were resolved by the Schemes and are summarized as follows:

| Liabilities (in £) | |
|---|---|
| Sub-Participants' Proof of Debt Claims[22] | 65,153,409.63 |
| Kaupthing Proof of Debt Claim (admitted amount) | 177,278,839.44 |
| Kaupthing Finance Proof of Debt Claim (admitted amount) | 141,519,871 |
| Oscatello Proof of Debt Claim | 67,588,985[23] |
| Sundry Creditors' Claims | 89,004.88 |
| **Total** | **451,630,109.95** |

27.    Prior to the Schemes becoming effective, the Company had liabilities to the Sub-Participants under the Sub-Participation Agreements.  The total amount of the original sub-participations was £45 million, among twenty-five Sub-Participants in differing proportions. The proof of debt claims of the Sub-Participants have been admitted in the aggregate amount of £65.16 million (which includes pre-petition interest).  As set out in paragraphs 53-57 below, the Schemes provide for the release and discharge of these claims in exchange for the consideration described in the Schemes.

28.    In addition, the Company's liabilities to Kaupthing and Kaupthing Finance are related to a number of the Pre-Liquidation Transactions, including the Framework Agreement, the Basiliko Transaction, the Redford Transaction and the Alumdawn Transaction. Kaupthing submitted a proof of debt claim for £186,336,611.78 on account of certain loans and other funding in connection with the Pre-Liquidation Transactions.  Kaupthing Finance submitted a proof of debt claim for £140,669,370 on account of the KF Promissory Notes.  As discussed below, Kaupthing's and Kaupthing Finance's proof of debt claims have been admitted

---

[22] This figure includes a proof of debt claim from Mön Investments now extinguished pursuant to the terms of the Schemes and a £986,964 claim assigned to Kaupthing.

[23] Liability on this amount is pending the outcome of the Revised 599 Proceedings.

in the amounts of £177,278,839.44 and £141,519,871, respectively. Under the terms of the Schemes, the Company entered into the Kaupthing Facility Agreement with Kaupthing, and the KF Facility Agreement with Kaupthing Finance (each as defined in the Schemes and together, the "New Facility Agreements"). The effect of the New Facility Agreements will be that Kaupthing and Kaupthing Finance will postpone their entitlement to a distribution on the Kaupthing Admitted Claim and the KF Admitted Claim (each as defined in the Schemes) and continue as creditors of the Company on a limited recourse basis with the aim of ensuring the Company's solvency going forward.

29.    Further, as noted above, Oscatello asserted a claim against the Company for the amount of £67,588,985 (the "Oscatello Trust Claim"). As set forth above, the Liquidator initially rejected Oscatello's proof of debt claim; however, pursuant to the Schemes, the Liquidator accepted (on behalf of the Company) part of the Oscatello Trust Claim and as a result the Company paid to Oscatello the Undisputed Amount (as defined in the Schemes), comprising the sum of £28,570,113 plus interest. The Company currently disputes Oscatello's entitlement to the Resulting Amount (comprising part of the Somerfield Proceeds and the remainder of the Oscatello Trust Claim), which are being held in trust by the English Court, pending the outcome of the Revised 599 Proceedings.

30.    Finally, the Schemes provide for payment in full of Boodle Hatfield LLP and Callin Wild LLC (together, the "Sundry Creditors"), who claimed an aggregate amount of £89,004.88 for legal services they provided in connection with the Company's winding up and certain of the aforementioned legal actions.

31.    The payment of the distributions referred to above have taken place. Accordingly, as of the date of this Declaration, the Company's liabilities (excluding Oscatello's

claim to the Resulting Amount) total £293,294,813.29 (excluding interest) on a limited recourse

basis, as set out below:

| Liabilities (in £) | |
|---|---|
| Kaupthing Facility Agreement | 163,096,532.29 |
| Kaupthing Finance Facility Agreement | 130,198,281.00 |
| **Total** | **293,294,813.29** |

32.    Further information regarding the treatment of the claims of the Sub-

Participants, Kaupthing, Kaupthing Finance, Oscatello and the Sundry Creditors are set out

below.

**III.    The Liquidation and the Isle of Man Scheme Proceeding**

**A.    The Company's Liquidation Proceedings and Overview of the
Administration of the Company by the Liquidator**

33.    As a result of the international liquidity crisis commencing in the mid to

late 2000s, and the displacement of Kaupthing's board of directors, it became apparent to the

Company's directors that the Company was facing severe financial difficulty.  In late February

2010, the Company's directors instructed Callin Wild LLC, an Isle of Man law firm, to

commence the Company's winding up proceedings in its own name in the Isle of Man, and to

also seek the appointment of a liquidator provisional on the basis that the Company was unable

to pay its debts, its books and records were incomplete, and it had been subject to various

competing claims by creditors to its assets.

34.    Prior to commencing the aforementioned proceedings, on March 1, 2010,

Kaupthing served a demand on the Company for approximately US$127 million for amounts

claimed under the arrangements described above.  On March 3, 2010, as a result of the Company

failing to make payment in accordance with Kaupthing's letter of demand, Kaupthing applied to

have the Company wound up in the Isle of Man.  The Company's directors also supported the

winding up application.  On March 8, 2010 (the "Appointment Date"), the Isle of Man Court

appointed Mr. Shimmin as Liquidator Provisional (the "Liquidator Provisional Order"), and then

on March 29, 2010, it ordered his appointment as Liquidator (the "Liquidator Order").  True and

correct copies of the Liquidator Provisional Order and the Liquidator Order are attached at

Appendix 2 to the Explanatory Statement, which is attached hereto as Exhibit D.

35.     On the Appointment Date, Mr. Shimmin, as Liquidator Provisional, and

later as Liquidator, took control of the affairs of the Company from his offices in the Isle of Man,

including but not limited to inspecting and reviewing the Company's books and records and

attending to a number of statutory matters, including convening meetings of the Company's

creditors.  He also took control over all of the previously described legal actions.

36.     The Liquidator Provisional Order expressly granted Mr. Shimmin the

authority to exercise various powers with respect to the administration of the Company.

Specifically, the Isle of Man Court granted Mr. Shimmin, as Liquidator Provisional, the

following powers:

    a.  to continue, bring or defend any action or other legal
proceeding whether within or outside of this jurisdiction in the
name and on behalf of the Company (including any application
to recognise the appointment of Andrew Paul Shimmin as
Liquidator provisionally) for the appointment of any legal
advisors in relation thereto;

    b.  to take possession of all of the assets of the Company, for the
beneficial preservation of those assets;

    c.  to appoint an Advocate or such other legal adviser and/or law
agent to assist him in the performance of his duties;

    d.  with the consent of the [Isle of Man] Court to sell the real or
personal property, and things in action of the Company, with
power to transfer the whole thereof to any person or any
company, or to sell the same in parcels;

    e.  for the purpose of preservation of the assets of the Company
and/or conducive to the discharge of his duties and functions,
to do all acts and to execute, in the name and on behalf of the

Company, all deeds, receipts, and other documents, and for that
purpose to use, when necessary, the Company's seal;

f.  to open and maintain a bank account;

g.  to raise on the security of the assets of the Company any
money requisite;

h.  to appoint an agent to do any business which he is unable to do
himself;

i.  to do all such other things as may be necessary for preserving
the assets of the Company;

j.  to manage the affairs of the Company;

(Liquidator Provisional Order at ¶¶ 2.a-j.)

37.     The Liquidator Order also expressly granted Mr. Shimmin the authority to

exercise various powers with respect to the administration of the Company.  Specifically, the Isle

of Man Court granted Mr. Shimmin, as Liquidator, the following powers:

a.  Subject to further Order, to open, maintain and operate without
the further consent of any other person such bank accounts as
are deemed necessary by him;

b.  continue, bring or defend any action or other legal proceeding
whether within or outside of this jurisdiction in the name and
on behalf of the [Company] (including any application to
recognise the appointment of Andrew Paul Shimmin as
Liquidator of the [Company], whether provisionally or
otherwise) and for the appointment of any legal advisers in
relation thereto;

c.  to appoint an Advocate or such other legal adviser and/or law
agent (whether in the Isle of Man or elsewhere) to assist him in
the performance of his duties; and

d.  such other powers as are provided pursuant to section 184(2) of
the [Companies Act].

(Liquidator Order at ¶¶ (4)a-d.)  Separately, section 184(2) of the Companies Act, a true and

correct excerpted copy of which is attached hereto as Exhibit J, granted Mr. Shimmin, as

Liquidator, extremely broad authority to control the Company's affairs.  That authority consisted

of, among other things, authority to sell property, enter into and execute agreements, control

insolvency proceedings, make promissory notes, offer Company property as collateral, appoint

agents, and more.  Indeed, until midnight on March 31, 2015, the Liquidator had fulsome and complete control of the Company, in the Isle of Man, for nearly five years.

###### B.      The Nominated Directors are Foreign Representatives of the Company

38.      I understand that a chapter 15 proceeding is commenced by the filing of a petition for recognition (and related documents) by the "foreign representative."  I further understand that a bankruptcy court may presume that the person petitioning for chapter 15 recognition is a foreign representative if the decision or certificate from the foreign court so indicates.  I understand that the Bankruptcy Code defines "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."  11 U.S.C. § 101(24).

39.      Here, the Isle of Man Sanction Order expressly states:

> **AND THE COURT FURTHER DECLARES THAT** for the purposes of any application for recognition of or assistance in connection with the Scheme which may be made in the British Virgin Islands and/or any state of the United States of America including, without limitation, under Chapter 15 of the United States Bankruptcy Code, (but without prejudice to a decision of the Courts of either the British Virgin Islands and/or the United States of America) upon the Scheme becoming effective and by virtue of its terms;
>
> . . . The Nominated Directors (as defined in the Scheme), when appointed, will be persons authorised to act as representatives of the Company and the Scheme including acting as a foreign representative in any proceedings under Chapter 15 of the United States Bankruptcy Code.

(Isle of Man Sanction Order paragraphs 3, 5.)  Additionally, section 49 of the Isle of Man Scheme provides that "[t]he Nominated Directors shall be authorised to act as representatives for the Company on any application for recognition and assistance in relation to [the Isle of Man Scheme] . . . in any jurisdiction and under whatever laws including . . . Chapter 15 of the United

States Bankruptcy Code . . . ."  (Isle of Man Scheme § 49.)  Accordingly, on the Effective Date, the Nominated Directors were granted authority to act as Foreign Representatives of the Company in a case under chapter 15 of the Bankruptcy Code.  As noted above, Mr. Scheving Thorsteinsson and I were appointed as the Nominated Directors on March 19, 2015, which appointment took effect at midnight on March 31, 2015 pursuant to an order made on March 26, 2015 by the Isle of Man Court.  In light of the statutory presumption, the Bankruptcy Code's definition of "foreign representative" and the express provisions of the Isle of Man Sanction Order and the Isle of Man Scheme, I believe that Mr. Scheving Thorsteinsson and I, as Nominated Directors, are foreign representatives of the Company.

### C.    The Isle of Man Scheme Proceeding is a Foreign Main Proceeding

40.    For the reasons set forth below, I believe that the below-discussed proceeding pursuant to which the Isle of Man Scheme was proposed, solicited and sanctioned (such proceeding, the "Isle of Man Scheme Proceeding") is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code.

### 1.    The Isle of Man Scheme Proceeding is a "Foreign Proceeding"

41.    The Isle of Man Scheme Proceeding is a judicial proceeding subject to the control and supervision of the Isle of Man Court for the purpose of, among other things, restoring the Company to a position of solvency.  The Isle of Man Scheme Proceeding is collective, with due process, including proper notice and an opportunity to participate, for groups of, and individual, creditors and interested parties.  Accordingly, I believe that the Isle of Man Scheme Proceeding is a "foreign proceeding" within the meaning of Section 101(23) of the Bankruptcy Code.

### 2.    The Isle of Man Scheme Proceeding is a "Foreign Main Proceeding"

42.    I understand that Section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is pending in the country where the debtor has "the center of its main interests" ("COMI").  I am further informed that, although the Bankruptcy Code does not define COMI, Section 1516(c) of the Bankruptcy Code establishes that a debtor's "registered office" is presumed to be the debtor's COMI in the absence of evidence to the contrary.

43.    The Company is incorporated and maintains its registered office in the Isle of Man (which it has done both before and after the commencement of the Isle of Man Scheme Proceeding and the sanction of the Isle of Man Scheme).  Moreover, the Company's books and records are located in the Isle of Man.

44.    From the date of Mr. Shimmin's appointment as Liquidator Provisional, and then as Liquidator, in March 2010, to midnight on March 31, 2015, he directed and coordinated the Company's affairs from the Isle of Man pursuant to the Liquidator Provisional Order and the Liquidator Order.

45.    The Company was previously managed by the Former Directors, whose members reside in the Isle of Man and England.  After entry of the Liquidator Order, all of the Former Directors' responsibilities and decision-making authority with respect to the Company were transferred to Mr. Shimmin.  During his time as Liquidator, he supplanted the Former Directors in virtually every respect.  For nearly five years, the Company's activities were centered around restoring solvency and resolving all litigation surrounding the Pre-Liquidation Transactions consistent with his duties as Liquidator.  Mr. Shimmin conducted all liquidation and business affairs of the Company from his offices in the Isle of Man.  To the best of my knowledge, and based upon information provided to me by my advisors and the Company's

current English and Manx law advisers, Mr. Shimmin undertook, among other things, the

following activities from and within the Isle of Man:

(i)        Holding, reviewing and analyzing the Company's books and records (See Explanatory Statement at 4.6(d));

(ii)       Operating bank accounts in the Isle of Man in the Company's name, which accounts serve as the primary cash accounts for the Company (See Explanatory Statement at 4.2(a); Explanatory Statement at Appendix 10 (*Liquidator's Reports to Creditors*)); as of May 7, 2015, amounts of approximately £3,738,763.73 and $1,191,067.32 were held in the Company's IOM Bank Accounts;

(iii)     Negotiating the Isle of Man Scheme and each of the documents related thereto with the Known Scheme Creditors, all parties to the Ongoing Litigation and other key constituencies (See Explanatory Statement at 4.10);

(iv)     Carrying out investigations of the Pre-Liquidation Transactions (See Explanatory Statement at 4.7(d); Explanatory Statement at Appendix 10 (*Liquidator's Reports to Creditors*));

(v)       Monitoring and directing the Company's remaining investments, including, without limitation, its investment in Spirit (See Explanatory Statement at 4.7(f)-(g));

(vi)     Investigating various aspects of the affairs of management of the Company prior to his appointment (See Explanatory Statement at 4.7(d); Explanatory Statement at Appendix 10 (*Liquidator's Reports to Creditors*));

(vii)    Reviewing and analyzing all proof of debt claims (See Explanatory Statement at 4.3);

(viii)   Negotiating and signing agreements on behalf of the Company, including, but not limited to, documents in connection with the Isle of Man Scheme (See, e.g., Deed of Settlement and Release);

(ix)     Signing reports to creditors and the Isle of Man Court on behalf of the Company (See, e.g., Explanatory Statement at Appendix 10 (*Liquidator's Reports to Creditors*); Chairperson's Report (defined below));

(x)       Responding to inquiries from the Company's creditors and their advisors concerning the Liquidation and, later, the Scheme Proposal (defined below);

(xi)     Considering and planning the Isle of Man Scheme to effect a successful restructuring (See, e.g., Explanatory Statement at 4.10; Scheme Proposal);

(xii)    Sending notices to all of the Company's known creditors regarding the Liquidation, which notices are sent from the Isle of Man with an Isle of Man return address (See, e.g., Explanatory Statement at 8.3(e); Explanatory Statement at Appendix 10 (*Liquidator's Reports to Creditors*));

(xiii)   Filing a number of applications with the Isle of Man Court seeking approval for (among other things) payment of the Liquidator's remuneration and expenses (See, e.g., Explanatory Statement at Appendix 10 (*Liquidator's Reports to Creditors*));

(xiv)    Filing an application with the Isle of Man Court seeking consent from the Isle of Man Court to sanction the power of the Liquidator to launch the Schemes (See Explanatory Statement at Clause 3);

(xv)     Paying the Company's expenses, which were predominantly paid out of the IOM Bank Accounts;

(xvi)    Reviewing and approving the Isle of Man Scheme as proposed to the Isle of Man Court and submitting affidavits and witness statements in support thereof;

(xvii)   Authorizing and overseeing the solicitation of the Isle of Man Scheme (See Explanatory Statement at Part D);

(xviii)  Publishing notice of solicitation of the Isle of Man Scheme (See Isle of Man Sanction Order at 1 ("the Court being satisfied that the Scheme Creditors (as defined in the [Isle of Man] Scheme) had been given the requisite notice of the Scheme Meeting")); and

(xix)    Following the Isle of Man Scheme Meeting (defined below), assisting in preparing the Chairperson's Report in respect of the Isle of Man Scheme Meeting.

46.     Since the Nominated Directors were appointed and Mr. Shimmin vacated office as Liquidator, the Company has continued to take actions and conduct business through its agents and attorneys in the Isle of Man. Indeed, on April 21, 2015, the Company's board of directors held a meeting in the Isle of Man. The Company has not undertaken any actions which would cause its COMI to be situated outside of the Isle of Man. The Company has not held any

board meetings outside of the Isle of Man, nor sent any communication to third parties which would cause any third party to conclude that its COMI is situated elsewhere than of the Isle of Man.

47.    For the foregoing reasons, I believe that the Company's COMI is the Isle of Man and that this Court should therefore recognize the Isle of Man Scheme Proceeding as a foreign main proceeding.

## IV.    The Isle of Man Scheme

### A.    Overview of the Isle of Man Scheme

48.    The terms of the Isle of Man Scheme are the result of lengthy and thorough negotiations among the Company, Kaupthing and certain of the Sub-Participants regarding the aforementioned litigation, particularly the Action 599 Proceedings.  On June 3, 2014, the Winding Up Committee, certain of the Sub-Participants (the "Consenting Sub-Participants"), and Zaria Global, entered into a term sheet (the "Scheme Proposal"), the terms of which serve as the backbone of the Isle of Man Scheme in its as-sanctioned form.  The Liquidator reviewed and ultimately agreed to the Scheme Proposal.  A true and correct copy of the Scheme Proposal is attached at Appendix 3 to the Explanatory Statement, which is attached hereto as Exhibit D.[24]

49.    The purposes of the Isle of Man Scheme are to:

(i)    restore the Company to a position of solvency, free from historic liabilities (with the exception of the Oscatello Trust Claim[25] to be determined in the Revised 599 Proceedings and the claims raised by the Company against the Former Directors in the Action 363

---

[24] Capitalized terms used but not defined in this section shall have the meanings ascribed to them to them in the Isle of Man Scheme.

[25] The "Oscatello Trust Claim" is defined in the Explanatory Statement as "the claims asserted by Oscatello against the Company in the Oscatello Proof of Debt and the Action 599 Proceedings."  See Explanatory Statement at Appendix 1.  Oscatello's proof of debt claim and the Revised 599 Proceedings are discussed in detail in Clause 5.6 of the Explanatory Statement.

Proceedings and the Revised Isle of Man Proceedings, which are not compromised as part of the English Scheme or the Isle of Man Scheme), so that the winding up can be stayed and the Company can be returned to the control of its shareholder and the Nominated Directors (as defined in the Schemes);

(ii)    provide the creditors of the Company with certainty, and a cost-efficient outcome, by valuing and compromising the claims of all of the Company's creditors and putting an end to the Ongoing Litigation (as defined in the Schemes); and

(iii)    provide the Scheme Creditors with a swift resolution by providing prompt payment of a cash dividend in respect of their claims.

**B.    The Creditors of the Schemes and Distributions**

50.    The Scheme Creditors formed only one voting group or class of creditors under the Isle of Man Scheme.    Additionally, certain other creditors, namely Kaupthing, Kaupthing Finance and the Sundry Creditors, have by consent had their claims treated under the Isle of Man Scheme, but are not in the class of Scheme Creditors (save for Kaupthing's interest in an assigned sub-participation claim).    The claims of these parties are receiving separate treatment in accordance with the laws of the Isle of Man, as discussed in relation to the New Facility Agreements (see below).

51.    The Scheme Creditors can be sub-divided into two groups, the (i) "Known Scheme Creditors" (i.e., those parties who entered into the Sub-Participation Agreements with the Company with unsecured claims against the Company); and (ii) the "New Scheme Creditors" (i.e., any creditors who were not known to the Company at the time the Schemes became effective); however, they formed a single class for voting purposes as they had rights that were sufficiently similar that they could properly consult together with a view to their common interest.[26]    Under the Isle of Man Scheme, a bar date of January 28, 2015 was established for

---

[26] As discussed above, the Isle of Man Scheme also groups together the Sundry Creditors, however the Sundry Creditors are not considered Scheme Creditors.    See Explanatory Statement at p. 7.    The Sundry Creditors' claims,

New Scheme Creditors to submit their claim forms in respect of any claims they may have (the "Scheme Bar Date").  No New Scheme Creditors lodged any claim forms by the Scheme Bar Date.  Generally, subject to certain limited exceptions, Scheme Creditors have been paid £0.92 per £1.00 of their "Admitted Claim" (such amount, the "Cash Distribution Amount") under the Isle of Man Scheme.[27]

### C.   The New Facility Agreements

52.     As discussed above, the Liquidator initially rejected Kaupthing's proof of debt claim and Kaupthing Finance's proof of debt claim, which Kaupthing and Kaupthing Finance challenged in the Proof of Debt Proceedings.  In order to resolve this dispute, and as part of the overall settlement embodied in the Isle of Man Scheme, Kaupthing's proof of debt claim has been admitted in the amount of £177,278,839.44 (the "Kaupthing Admitted Claim") and Kaupthing Finance's proof of debt claim has been admitted in the amount of £141,519,871 (the "KF Admitted Claim").[28]  For purposes of distribution on the Kaupthing Admitted Claim and the KF Admitted Claim, the Company is entering into the New Facility Agreements with Kaupthing and Kaupthing Finance.  Under the New Facility Agreements, Kaupthing and Kaupthing Finance will receive an amount equal to the Cash Distribution Amount, but on a deferred and limited recourse basis over a period of ten years.  The New Facility Agreements mature on October 31, 2024.  The Company is expected to fund the required payments under the New Facility Agreements from its own assets.  With respect to claims under the New Facility Agreements, Kaupthing and Kaupthing Finance will have recourse only to sums arising out of the Tazamia B

---

in the aggregate of £89,004,88, will be satisfied in full.  See Explanatory Statement at Clauses 5.2(a)(iv) and 5.4.

[27] The treatment and description of the Scheme Creditors is discussed in detail in Clause 5.3 of the Explanatory Statement.

[28] The reason why the KF Admitted Claim is higher than the amount claimed in Kaupthing Finance's proof of debt claim is to make the determination of Kaupthing Finance's claim consistent with the treatment of the claim for interest on the Admitted Claims of the Known Scheme Creditors.

Shares, the Spirit Shares, any proceeds from the Resulting Amount that are currently subject to the Revised 599 Proceedings, cash from the IOM Bank Accounts, and replacement assets replacing any of the aforementioned assets. If insufficient funds are generated from the Company's assets to satisfy its obligations under the New Facility Agreements, Kaupthing and Kaupthing Finance will not be entitled to take any further steps against the Company to recover outstanding sums, and no further debts will be owed by the Company to Kaupthing and Kaupthing Finance.[29]

**D.    Releases, Indemnities and Injunctions in the Isle of Man Scheme and the Deed of Settlement and Release**

53.    The Isle of Man Scheme and the Deed of Settlement and Release in connection therewith, which was executed by the Company on January 20, 2015 on behalf of the Scheme Creditors pursuant to the terms of the Isle of Man Scheme and by the Liquidator, each of the Sundry Creditors, Kaupthing, Kaupthing Finance, Oscatello, Eliza and others, contain certain release and indemnification provisions. The following discussion of the Isle of Man Scheme's release, indemnity and injunction provisions, and the Deed of Settlement and Release, is summary in nature. The release provisions of the Isle of Man Scheme are found in Clause 35 thereof. The indemnity provisions of the Isle of Man Scheme are found in Clauses 14-15 of the Deed of Settlement and Release. The injunctive provisions of the Isle of Man Scheme are found in Clause 11 thereof. Furthermore, a true and correct copy of the executed Deed and Settlement of Release is attached hereto as Exhibit K.

54.    The Isle of Man Scheme provides for certain baseline release, indemnity and injunction provisions, while the Deed of Settlement and Release includes additional release

---

[29] The New Facility Agreements, and the recourse provisions, are discussed in detail in Clause 5.5(h)-(l) of the Explanatory Statement at pages 38-40.

provisions. The combined aim is to bring an end to the litigation related to the Pre-Liquidation

Transactions (save for the Revised 599 Proceedings, the Revised Isle of Man Proceedings and

the Action 363 Proceedings) with the consent of each of the parties thereto.

      55.    Generally, under the Isle of Man Scheme and the Deed of Settlement and

Release, the following releases are provided (among others):

(i)      each Scheme Creditor grants releases in favor of, subject to certain limitations: (i) the Company from all pre-Effective Date claims; (ii) the Released Advisers and their Personnel, the Former Directors and the Former Directors' Advisers and their Personnel, and the Affiliates of the Company, (each term as defined in the Schemes), from all pre-Effective Date claims relating to the affairs of the Company and/or their investment in the Company; and (iii) Kaupthing, Kaupthing Finance, Eliza, Oscatello, and each of their Affiliates, from all pre-Effective Date claims related to the Sub-Participation Agreements and the Framework Agreement;

(ii)      the Company grants releases in favor of, subject to certain limitations: (i) the Scheme Creditors, Eliza, Kaupthing, Kaupthing Finance, and each Sundry Creditor, from all pre-Effective Date claims relating to the affairs of the Company; (ii) Oscatello from all pre-Effective Date claims, excluding those connected to the Revised 599 Proceedings; and (iii) the Released Advisers and their Personnel from all pre-Effective Date claims relating to the affairs of the Company;

(iii)      each of the Company, Kaupthing, Kaupthing Finance, and each Scheme Creditor, grants releases in favor of, subject to certain limitations: (i) the Liquidator; and (ii) the Scheme Supervisor;

(iv)      each of Kaupthing, Kaupthing Finance, Eliza, and each Sundry Creditor, grants releases in favor of, subject to certain limitations: (i) the Company from all pre-Effective Date claims; and (ii) the Released Advisers and their Personnel, and the Affiliates of the Company, from all pre-Effective Date claims relating to the Company and/or their investment in the Company;

(v)      Oscatello grants releases in favor of, subject to certain limitations: (i) the Company from all pre-Effective Date claims; (ii) the Consenting Sub-Participants from all pre-Effective Date claims related to the Sub-Participation Agreements and the Framework Agreement; and (iii) the Released Advisers and their Personnel

29

from all pre-Effective Date claims relating to the Company and/or their investment in the Company;

(vi)    Eliza grants releases in favor of, subject to certain limitations, the Consenting Sub-Participants from all pre-Effective Date claims relating to the Sub-Participation Agreements and the Framework Agreement; and

(vii)   Kaupthing and Kaupthing Finance grant releases in favor of the Consenting Sub-Participants from all pre-Effective Date claims related to the Sub-Participation Agreements and the Framework Agreement.

56.    Generally, and subject to certain limitations, under the Isle of Man Scheme and the Deed of Settlement and Release, the Company, Kaupthing, Kaupthing Finance, Eliza, Oscatello, and the Scheme Creditors, indemnify each other for claims for which any of such parties or their Affiliates may be liable directly or indirectly from the pursuit of waived or released claims under the Isle of Man Scheme. Kaupthing also agrees to indemnify Consenting Sub-Participants from certain third-party claims in connection with the Sub-Participation Agreements.

57.    Finally, Clause 11 of the Isle of Man Scheme prevents Scheme Creditors from taking or continuing any steps or proceedings against the Company, Kaupthing or Kaupthing Finance, and each of their subsidiaries, in any jurisdiction, for the purpose of obtaining payment on Scheme Claims.

58.    I believe that the release, indemnity and injunction provisions are appropriate given the facts and circumstances preceding the filing of the Chapter 15 Petition and the Isle of Man Scheme. There is a clear identity of interest among all parties implicated by the release, indemnity and injunction provisions in that they have all invested considerable time, efforts, and even costs, in formulating, negotiating and implementing the Isle of Man Scheme. Furthermore, it is my opinion that each of such parties has a vested interest in obtaining United

States enforcement and recognition of the Isle of Man Scheme. The parties benefiting from the release, indemnity and injunction provisions have each made important contributions to the Isle of Man Scheme, starting with the negotiation and formulation of the Scheme Proposal, through to obtaining sanction of the Isle of Man Scheme.

59.      Importantly, the Company fully disclosed the terms and scope of all releases, indemnification provisions and injunctions in the Explanatory Statement. As set forth below, the Isle of Man Scheme was unanimously supported by voting creditors. Thus, approving all releases provides creditors with the benefit of their bargain in accepting the Isle of Man Scheme. Moreover, such provisions are an integral component of the Isle of Man Scheme. Indeed, the release of complex litigation is the crux of the Isle of Man Scheme. Without the releases provided therein, the Isle of Man Scheme would be devoid of its central purpose. Without the releases contemplated in the Isle of Man Scheme and the Deed of Settlement and Release, the Company could also remain exposed to potential contribution and indemnity claims and the Isle of Man Scheme could suffer a collateral attack to the prejudice of the Company, its Scheme Creditors, and other interested stakeholders.

### E.      Solicitation and Sanction of the Isle of Man Scheme

#### 1.      Scheduling and Notice

60.      On October 10, 2014 the Liquidator and Kaupthing applied to the Isle of Man Court for an order under section 184(1)(a) of the Companies Act to sanction the power of the Liquidator to bring an action in the Isle of Man Court seeking an order under section 152 of the Companies Act to sanction the Isle of Man Scheme. On October 14, 2014, the Isle of Man Court granted an order sanctioning the power of the Liquidator to propose the Isle of Man Scheme.

61.     On November 13, 2014, the Liquidator and Kaupthing applied to the Isle of Man Court for an order under section 152 of the Companies Act to sanction the power of the Liquidator to convene a meeting of Scheme Creditors for the purposes of considering and, if thought fit, approving the Isle of Man Scheme (such meeting, the "Isle of Man Scheme Meeting").  On November 18, 2014 the Isle of Man Court entered an order (the "Convening Order") permitting the Company, acting by the Liquidator, to convene the Isle of Man Scheme Meeting.  The Isle of Man Court set the Isle of Man Scheme Meeting to be held on December 15, 2014 at 11:15 a.m. (London Time) at the offices of the Company's English solicitors, Boodle Hatfield LLP, at 240 Blackfriars Road, London SE1 8NW (the "Boodle Office").

### 2.     Isle of Man Scheme Solicitation

62.     The Convening Order required that at least twenty-one days prior to the Isle of Man Scheme Meeting, copies be provided of the Isle of Man Scheme, the Deed of Settlement and Release, the Explanatory Statement, the notice convening the Isle of Man Scheme Meeting (the "Notice"), a claim form ("Claim Form") and a proxy form (a "Proxy Form" and, collectively with the aforementioned documents, the "Notice Documents"), by e-mail or, in certain circumstances, by hard copy to each person that the Liquidator knew, or believed may be, a Scheme Creditor.  The Convening Order also required that notice of the Isle of Man Scheme Meeting be published at least ten business days in advance of the Isle of Man Scheme Meeting in *The Financial Times*, *The Isle of Man Courier*, *The Isle of Man Examiner*, *The Lögbirtingablað* and *The London Gazette*.  Shortly prior to the time the Isle of Man Court sanctioned the Isle of Man Scheme, the Liquidator reported to the Isle of Man Court that all due and proper notice as required by the Convening Order, including proper service of each of the Notice Documents, was given.

63.  As discussed above, the Notice Documents contained a Proxy Form, which was used to cast votes on the Isle of Man Scheme.  A true and correct copy of the Proxy Form is attached at Appendix 8 to the Explanatory Statement, which is attached hereto as <u>Exhibit D</u>.  The Proxy Form generally contains the following sections:

    (i)    A section devoted to general instructions regarding the voting procedures and a description of each of the solicitation documents.

    (ii)    A section used by Scheme Creditors to vote on the Isle of Man Scheme.  A Scheme Creditor was authorized to provide its voting directions on the Proxy Form and designate an individual, which could be the chairman of the Isle of Man Scheme Meeting, to be such Scheme Creditor's proxy to vote at the Isle of Man Scheme Meeting.  A Scheme Creditor could also attend the Isle of Man Scheme Meeting and vote in person.  This section of the Proxy Form also contained a section in which a Scheme Creditor was to provide details regarding the nature of its Scheme Claim.

    (iii)    A "Distribution Confirmation Deed" pursuant to which a Scheme Creditor made certain confirmations regarding, without limitation, jurisdiction, distributions, understanding of releases (which were described therein), and review of the Notice Documents.

64.  Proxy Forms were required to be returned to the Liquidator, by mail, fax or e-mail, by December 12, 2014 at 10:00 a.m. (London Time).[30]

**3.  Isle of Man Scheme Meeting, Voting Results and Sanction of the Isle of Man Scheme**

65.  The Isle of Man Scheme Meeting convened, as scheduled, on December 15, 2014 at 11:15 a.m. (London Time) at the Boodle Office.  The Liquidator was the chairperson of the Isle of Man Scheme Meeting.  After the Isle of Man Scheme Meeting, on December 16, 2014, the Liquidator provided to the Isle of Man Court a report of the Isle of Man Scheme

---

[30] The Notice Documents inadvertently provided that the proxy forms were due by December 12, 2014 at 5:00 p.m. (London Time).  As chairperson of the Isle of Man Scheme Meeting, the Liquidator had the authority to accept late proxy forms.  Certain proxy forms came in on December 12, 2014, but between the hours of 10:00 a.m. and 5:00 p.m. (London Time).  The Liquidator accepted each of such proxy forms.

Meeting (the "<u>Chairperson's Report</u>"), a true and correct copy of which is attached hereto as

<u>Exhibit L</u>.

66.    Seventeen Scheme Creditors attended the Isle of Man Scheme Meeting, either in person or by proxy.  Those Scheme Creditors voted unanimously in favor of the Isle of Man Scheme.  Notably, insiders of the Company agreed not to partake in voting to sanction the Isle of Man Scheme.  The following chart provides the voting results for the Isle of Man Scheme:

| Aggregate Value of Scheme Claims Voting on the Isle of Man Scheme | Percentage of Scheme Claims Voting in Favor of the Isle of Man Scheme – By Value | Percentage of Scheme Claims Voting in Favor of the Isle of Man Scheme – By Number |
|---|---|---|
| £56,958,031.55 | 100% | 100% |

67.    Pursuant to section 152 of the Companies Act a majority in number representing at least 75% (by value) of the Scheme Claims of each of the Scheme Creditors present and voting (whether in person or by proxy) at the Isle of Man Scheme Meeting must vote to approve the Isle of Man Scheme.  Accordingly, the Isle of Man Scheme was approved by the voting Scheme Creditors.  A hearing was held on December 22, 2014 at which the Isle of Man Court sanctioned the Isle of Man Scheme.  The Effective Date of the Isle of Man Scheme occurred on December 23, 2014.  Accordingly, the Isle of Man Scheme is binding on the Company and all Scheme Creditors.

**F.    The Isle of Man Scheme Should be Recognized and Enforced in the United States**

68.    Recognition and enforcement of the Isle of Man Scheme is necessary and appropriate under the circumstances.  Absent the requested relief, the Company's assets may be subject to litigation by certain creditors seeking to encumber such assets and potentially threaten the viability of the Isle of Man Scheme.  Indeed, the Company has significant assets in the

United States in the form of the Spirit Shares. The Spirit Shares have a trading value of approximately $114 million as of the date of this Declaration.

69.     Granting the requested relief would extend protections to enforce the terms of the Isle of Man Scheme, ensure the fair and equitable treatment of claim holders, and prevent any piecemeal litigation and potentially disruptive attacks on the Company's assets in the United States. As has been evidenced herein, and upon information and belief, the formulation, solicitation and approval of the Isle of Man Scheme was congruent with the process typically used for plans of reorganization in the United States Bankruptcy Courts. Moreover, the entire Isle of Man Scheme Proceeding provided creditors with due process protections consistent with those mandated in the United States, while simultaneously protecting the Company, its assets, and the interests of all stakeholders. Notably, the Isle of Man Scheme became effective with overwhelming creditor support, specifically 100% voting support. The Isle of Man Scheme is part of a comprehensive, consensual global restructuring that is the result of good faith, arm's-length negotiations among the Company, its key stakeholders and its litigation counterparts. I believe that recognizing and enforcing the Isle of Man Scheme in the United States would encourage international cooperation in cross-border insolvency proceedings. Accordingly, I believe that the Court should recognize and enforce the Isle of Man Scheme in this chapter 15 case.

*Signature Page Follows*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated: May 11, 2015

Arnaldur Jon Gunnarsson, solely in
his capacity as Nominated Director
and Foreign Representative of Murray
Holdings Limited by order of the High
Court of Justice of the Isle of Man

*Signature Page to Declaration of Arnaldur Jon Gunnarsson in Support of Chapter 15 Petition and Requested Relief*